Beatrice (Mrs. Benjamin) SCHLESIN-
GER and Ruth (Mrs. Benjamin) Glaz-
er, trading as Adelphia Nursing & Con-
valescent Home, or Berger's Nursing
& Convalescent Home, et al.

v.

BUILDING SERVICE EMPLOYEES IN-
TERNATIONAL UNION, LOCAL
252, AFL–CIO.

Civ. A. No. 72–1527.

United States District Court,
E. D. Pennsylvania.

Dec. 4, 1973.

John J. McAleese, Jr., Cunniff, Bray & McAleese, Plymouth Meeting, Pa., for plaintiffs.

Richard H. Markowitz, Markowitz & Kirschner, Philadelphia, Pa., for defendant.

## OPINION

EDWARD R. BECKER, District Judge.

### I. *Preliminary Statement*

This is a labor arbitration case which comes before us on cross motions for summary judgment.[1] The arbitrator awarded $29,500 in damages to the defendant Building Service Employees International Union, Local 252, AFL–CIO (Union). These damages resulted from the failure of the plaintiffs, a group of nursing home owners (Employers) whose employees were at one time represented by the Union,[2] to abide by a collective bargaining agreement. The facts are not in dispute. And despite the ingenuity of Employers' counsel, neither is liability, for the obligation of the

---

1. This Court has jurisdiction under section 301 of the Labor-Management Relations Act of 1947, 29 U.S.C. § 185 (1970).

2. The Union has ceased to represent these employees and the conduct of the plaintiffs is alleged to be a substantial factor in that state of affairs.

Employers to respond in damages was established in a state court proceeding which culminated in a decision by the Pennsylvania Supreme Court. That court found the Employers in breach of a collective bargaining agreement and ordered that damages be determined by arbitration.[3] In the present motions we are asked by the Union to enforce and by the Employers to vacate the award which resulted from the mandated arbitration proceeding.

The issue is whether the award should be set aside because: (1) it was beyond the power of the arbitrator; or (2) it violated the national labor policy; or (3) it was arrived at by reasoning that was so arbitrary and capricious as to violate due process. After reciting the facts in detail and disposing of the first two objections of the Employers, we will address this latter contention which we view as the principal and most difficult issue in the case.

## II. *The Undisputed Facts*

On August 1, 1959, the Employers and the Union entered into a collective bargaining agreement for a period of two years. The contract included, *inter alia*, provisions for recognition of the union, union security, dues checkoff, contributions to a medical center, and a grievance procedure culminating in submission of grievances and disputes to arbitration. The dues checkoff provision also stipulated that the Union would submit signed authorization cards to the Employers before the Employers would be obligated to withhold the employee's union dues.[4] This agreement expired on July 31, 1961 and a prolonged strike ensued. On January 23, 1962, a new collective bargaining agreement was signed which reinstated the 1959 contract with provision for automatic yearly renewal on each June 15th, subject to a right of either party to terminate on any subsequent June 15th with 30 days' notice. (This new collective bargaining contract is hereinafter referred to as the 1962 contract.) The Employers filed such notice of termination on May 10, 1963, stating that the contract would be terminated on June 15, 1963.

The Employers concededly failed to collect the initiation fees and dues for the Union or to make payments to the AFL medical center, or to comply with the Union security provisions under the 1962 contract. The Employers also refused to submit the dispute over their compliance to an arbitrator. Those actions by the Employers clearly violated the collective bargaining agreement and undermined the Union's bargaining position. While the Union was unable to demonstrate its majority representation by either forcing compliance with the contract or by negotiating a new contract, it did commence an action in the Court of Common Pleas of Philadelphia County, complaining of the Employers' refusal to comply with the 1962 contract. On October 9, 1970, the Pennsylvania Supreme Court found, *inter alia*, that the 1962 contract was valid and binding upon the parties, that the Employers breached said contract, and that the extent of damages incurred by the Union as a result of the Employers' breach was a matter properly to be determined by the arbitrator. The Court ordered that:

> . . . the parties submit to arbitration in accordance with the agreement, the question of the extent of past damages suffered by the Union as a result of Employers' failure to fullfil their obligations under the agreement.

Building Service Employees Int'l Union Local 252 v. Schlesinger, 440 Pa. 448, at 455, 269 A.2d 894, at 898 (1970).

---

3. Building Service Employees International Union Local 252 v. Schlesinger, 440 Pa. 448, 269 A.2d 894 (1970).

4. While it was conceded by the Union that these authorization cards were never proffered, the arbitrator found that such a technical breach did not obviate the Employers' liability under the contract, since it would have been futile in the circumstances for the Union to have presented such authorization cards.

The matter of damages was submitted to arbitration before Louis M. Gill, Esq., who, on June 15, 1972, awarded $29,500 to the Union. The award was composed of damages of $7,000 for the net loss of dues and initiation fees for the period from March 15, 1962, to June 15, 1963, when the contract was in effect, and of $22,500 for the consequential damages arising from lost dues and initiation fees for the period from June 15, 1963 up to the time of the award on June 15, 1972. In determining the $7,000 portion, the arbitrator relied on data furnished to the Union by the Employers. He rejected the Employers' arguments that the damages for the March 1962 to June 1963 period should be eliminated or mitigated because the Union failed: (1) to send the Employers signed authorization cards or (2) to make demands for discharge of employees who failed to pay their dues or initiation fees or (3) to collect such dues and initiation fees directly from the employees. In computing this $7,000 portion, the arbitrator counted only the *net* loss of income to the Union, and excluded that portion ($15,500) of the gross amount of dues and initiation fees that would have been turned over to the International Union and would have gone toward servicing the membership of the Employers. The arbitrator also excluded from the $7,000 portion of his award any damages based upon failure of the Employers to make contributions to the AFL Medical Center, since such breach did not result in any loss of income to the Local Union itself.

In calculating the consequential damages of $22,500, the arbitrator looked at the nine-year period from June 1963, when the 1962 contract was terminated, to June 1972, when he issued his award. He calculated that the net income from dues and initiation fees which the Local would have realized had it continued as bargaining agent with a check-off provision would have been about $5,000 per year or $45,000 for the nine-year period.

He concluded (see discussion *infra*) that there was about a 50-50 chance of the Union surviving for this period, and accordingly awarded consequential damages of $22,500, *i. e.* half the $45,000 figure. Adding the $22,500, consequential damages to the $7,000 damages for the period from March 1962 to June 1963, the total award was $29,500.[5]

### III. *Discussion*

In addressing the contentions of the parties, we must first review the relevant case law in order to chart the bounds of the arbitrator's authority and the scope of our review of his award. In the *Steelworkers* trilogy, United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S. Ct. 1358, 4 L.Ed.2d 1424 (1960); United Steelworkers of America v. American Manufacturing Co., 363 U.S. 564, 80 S. Ct. 1343, 4 L.Ed.2d 1403 (1960); United Steelworkers of America v. Warrior and Gulf Navigation Company, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960), which established the primacy of arbitration in the resolution of labor disputes, the Supreme Court set forth the principal limitations on an arbitrator's authority:

> [A]n arbitrator is confined to interpretation and application of the collective bargaining agreements; he does not dispense his own brand of industrial justice. . . . His award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award.

*Enterprise Wheel, supra* at 597, of 363 U.S., at 1361 of 80 S.Ct. In following the *Steelworkers* trilogy, the Third Circuit added:

> [W]e hold that a labor arbitrator's award does "draw its essence from the collective bargaining agreement" if the interpretation can in any rational

---

5. The arbitrator rejected the Union's request to double the award to compensate the Local for loss of prestige, position and standing.

way be derived from the agreement, viewed in the light of its language, its context, and any other indicia of the parties' intention; only where there is a manifest disregard of the agreement, totally unsupported by principles of contract construction and the law of the shop, may a reviewing court disturb the award.

Ludwig Honold Mfg. Co. v. Fletcher and United Auto Workers, Local 416, 405 F. 2d 1123, 1128 (3d Cir. 1969) (footnote omitted). And, in Swift Industries, Inc. v. Botany Industries, Inc., 466 F.2d 1125 (3d Cir. 1972), the court defined still further some of the limits on an arbitrator's authority:

> For, in holding that an arbitrator's award does not draw its essence from the agreement if the arbitrator's interpretation cannot be rationally derived therefrom, *Honold* has in addition to limiting the arbitrator's authority to fashion relief, also established that an award may not stand if it does not meet the test of fundamental rationality.

*Id.* at 1131.

■ The underlying rationale of these cases is that the arbitrator's authority is contractual rather than judicial in nature. His power is conferred by the collective bargaining agreement, and his duty with respect to that agreement is to settle disputes arising thereunder by applying and interpreting that agreement. So long as an arbitrator is not arbitrary, he has wide latitude in exercising his authority, especially in fashioning an appropriate remedy. *See* Mogge v. District 8, Int'l Assn. of Machinists, AFL–CIO, 454 F.2d 510 (7th Cir. 1971). An arbitrator does not even have to give reasons for his award, *Enterprise Wheel, supra* at 598 of 363 U.S., 80 S.Ct. 1358; it is sufficient that he bring his "informed judgment" to bear in order to reach a fair solution to the problem, *id.* at 597, 80 S.Ct. 1358 and that his award draw its essence from the agreement and meet the test of fundamental rationality.

■ The Supreme Court, in *Enterprise Wheel, supra,* specifically authorized judicial review of an arbitrator's award to determine whether he exceeded limits of his contractual power. But the scope of a court's review of an arbitrator's award is extremely limited. In *Ludwig Honold, supra* at 1132, of 405 F.2d, Judge Aldisert, in enforcing an arbitrator's award, stated:

> It is not within the province of a reviewing court to agree or to disagree with the conclusion reached or with the specific reasoning employed. Our sole function is to decide whether the arbitrator's interpretation met the test which the courts must apply in exercising the limited function of review in cases arising from labor arbitration.

Or, as our colleague, Judge Troutman put it in the recent case of American Can Co. v. United Papermakers and Paperworkers, AFL–CIO, 356 F.Supp. 495, 499–500 (E.D.Pa.1972):

> [U]nder *Ludwig Honold* it is the award rather than the conclusion or the specific reasoning employed that a court must review.

■ While an arbitrator's award may be vacated if it fails to draw its essence from the agreement, or fails to meet the test of fundamental rationality, these grounds are not exclusive. An arbitrator's award may be vacated for fraud, corruption, partiality, duress, or other misconduct on the part of the arbitrator. *See Ludwig Honold, supra* at n.27 of 405 F.2d. An award apparently may also be vacated if an arbitrator failed to comply with the requirements of due process, such as by refusing to hear material evidence, or if his decision was so unreasonable as to amount to a lack of due process. *See* Amalgamated Food & Allied Workers Union, Local 56 v. Great Atlantic & Pacific Tea Company, 415 F. 2d 185 (3d Cir. 1969). *See also* Dewey v. Reynolds Metal Company, 291 F.Supp. 786 (W.D.Mich.1968) (due process extends to arbitration proceedings dealing

with constitutional civil rights of parties involved).

■ The Employers' first contention is that the arbitrator's award is contrary to the express terms of the collective bargaining agreement and goes beyond the scope of his authority under the contract. In particular, the Employers argue that the arbitrator disregarded the provision in the contract which required the Union to present the Employers with authorization cards signed by the employees. As we pointed out in note 4, *supra*, the arbitrator found that the Union's technical breach in failing to present the cards did not eliminate the Employers' contractual obligations to check-off dues and initiation fees for the Union. Indeed, the arbitrator also found that in light of all the circumstances bearing on the Employers' breach of contract, it would have been merely a futile gesture for the Union to present such authorization cards. The Employers' first contention fails for two reasons. First, the arbitrator's findings on these points were well within the scope of his authority and met the test of rationality; hence they should not be set aside. Second, the Employers' argument represents an effort to reopen the issue of their liability for breach of contract, but we will not readjudicate this issue which was already resolved by the Pennsylvania Supreme Court and by the arbitrator. (See discussion *infra*.) So we hold that it was not beyond the arbitrator's authority and is within the essence of the contract for the arbitrator to award actual and consequential damages for the Union's loss of net income as a result of the Employers' failure to check off dues and initiation fees.[6]

■ The Employers' second argument is that the arbitrator's award violates sections 302(a) and (c)(4) of the Labor-Management Relations Act, 29 U. S.C. 186(a) and (c)(4) (1970), since there were no signed authorization cards. In section 302(a), Congress expressly proscribed any form of financial contribution to labor organizations or their representatives. This section would prima facie include such financial contributions as union dues and initiation fees. However, section 302(c)(4) permits an employer to deduct membership dues from an employee's wages and give such deductions over to the union *provided:*

> That the employer has received from each employee, on whose account such deductions are made, a written assignment which shall not be irrevocable for a period of more than one year, or beyond the termination date of the applicable collective agreement, whichever occurs sooner. . . ."

29 U.S.C. 186(c)(4) (1970). The Employers argue that the arbitrator's award of actual damages for the period from March 15, 1962, to June 15, 1963, and of consequential damages for the period from June 15, 1963, when the 1962 contract terminated, until June 15, 1972, violates both this specific provision and general federal labor policy, since it grants the Union the benefits of a collective bargaining agreement it could not win on its own. We reject these contentions because they seek to reopen the question of the Employers' liability

---

6. The Employers also contend that the arbitrator's award of $22,500 for consequential damages goes beyond his authority under the contract as interpreted by the Pennsylvania Supreme Court. The Pennsylvania Supreme Court had ordered the parties to "submit to arbitration, in accordance with the agreement, the question of the extent of *past* damages suffered by the Union as a result of the Employers' failure to fulfill their obligations under the agreement." Building Service Employees Int'l Union Local 252 v. Schlesinger, 440 Pa. 448, 455, 269 A.2d 894, at 898 (1970) (emphasis added). We interpret this order, as did the arbitrator, to include even consequential damages that may go beyond the termination date of the contract, as long as they are properly related to the Employers' breach of the contract. *See* Local 127, United Shoe Workers of America, AFL-CIO v. Brooks Manufacturing Co., 298 F.2d 277 (3d Cir. 1962) (court sustained award of compensatory damages for dues lost by Union to date of judgment and covering estimated 20-year future period).

which was already resolved by the Pennsylvania state court decisions. The Court of Common Pleas first found the contract to be valid and entered a *decree nisi* in favor of the Union, ordering the Employers to comply with the terms of the contract. After the Employers' exceptions were overruled by the court *en banc* and the decree made final, the Employers appealed to the Pennsylvania Supreme Court. That Court found the contract valid and enforceable and stated:

> Since the extent of the damages suffered by the Union *as a result of the Employers' failure to perform in accordance with the terms of the agreement* is a dispute under the agreement, it comes within the scope of the arbitration clause.

Building Service Employees Int'l Union Local 252 v. Schlesinger, 440 Pa. 448, 455, 269 A.2d 894, 897–898 (1970) (emphasis added). The Pennsylvania Supreme Court then ordered the parties to submit to arbitration only the question of damages, leaving the clear implication that the issue of liability had already been adjudicated. In a similar vein, the arbitrator found the Employers liable for breach of the 1962 contract with the Union, even though the Union had not submitted signed authorization cards. Since we view the Employers' argument that the award violates federal labor law and policy as an effort to relitigate liability, we reject this contention and will not set aside the arbitrator's award on this ground. *Cf.* Roy v. Jones, 484 F.2d 96 (3d Cir. 1973).

We turn then to the Employers' final contention which is that the $22,500 part of the award is utterly irrational and contrary to due process. In order to explicate the problem, we must first set forth the relevant passage from the arbitrator's decision:

> Calculating the damages for the period since the contract was terminated in June 1963 is a far different matter, and presents a much more difficult task of estimating, because many imponderables are involved. Unlike the March 1962–June 1963 period, when the contract was in force, there was no contract in force in this later period, and to award the same kind of damages here requires a conclusion that the Union would have continued as the bargaining agency if the Employers had not refused to carry out the union security and check-off provisions. I think it is by no means a sure thing that the Union *would* have survived as bargaining agency, even absent the violation of the 1962–63 contract. The Union appears to have been in a quite shaky position generally, as witness the highly unusual provision that the Union security and check-off provisions would not take effect until March 1962, although agreed upon in January, and as witness the Union's evident inability to bring any real pressure to bear on the Employers to live up to the contract or to negotiate another one.
>
> On the other hand, I think it is by no means a sure thing that the Union would *not* have survived as bargaining agent if the Employers had complied with these provisions. There is no doubt that the Union would have been in a stronger position in that event, when the contract term ended in June 1963; whether it would have been strong *enough* to survive a challenge to its majority status (which probably would have been made, from all the evidence), is strictly a matter of conjecture.
>
> It is unfortunate that on this crucial point in the case, the determination must be made by an educated guess, with no objective basis for making a firm and provable finding. But I am obligated to make the educated guess —I find no basis under the order of the Court or otherwise for saying that the burden of proof is on either side to prove that which obviously cannot be proven, and I think my clear obligation is to use my best judgment in estimating the *probability* of the Union's continuation as the bargaining agency, had the Employers complied

with these provisions prior to June 1963.

Weighing all the evidence and all the imponderables as best I can, I have concluded that the chances are about 50–50 that the Union would have survived as bargaining agency up until the present time, if these violations had not occurred. The net income from dues and initiation fees which the Local Union would have realized had it thus continued as bargaining agency (with the check-off, which it seems fair to assume would have been present in any contracts negotiated) appears to be in the area of $5000 per year, or a total of about $45,000 for the nine-year period from June 1963 to the present (June 1972). Since I have concluded that there was about a 50–50 chance of the Union surviving for this period, I think the appropriate award of damages is half of that amount, or $22,500. Added to the $7000 being awarded for the 15-month period from March 1962 to June 1963, that brings the total award to $29,500.

■ The Employers argue that the arbitrator's language referring to "conjecture," "guess," and "50–50 chance" indicate that he made an arbitrary decision without exercising his considered judgment, and indeed deprived them of procedural due process. *In terrorem,* the Employers contend that if the present award is upheld we could not review the arbitrator's method of arriving at his award, even if he had admitted to flipping a coin, or if he had found a 10% chance that the Union would survive and had therefore awarded 10% of all potential consequential damages. At first glance this contention is appealing. However, on reflection we recognize that, while an arbitrator's procedures, decision, and even his reasoning are subject to some limits and judicial review, such constraints are applied better by determining if the arbitration award reflects "the essence of the agreement," "the exercise of informed judgment," and "fundamental rationality," rather than by imposing due process terminology on the arbitration process. An arbitrator has a *quasi-judicial* function; the collective bargaining contract is the arbitrator's constitution and law. Moreover, an arbitrator's decision is different from a judge's or jury's decision which requires a finding based on a preponderance of the evidence. An arbitrator, unlike a judge or jury, may reach a "compromise" verdict on damages and set the award accordingly, especially if the contract reasonably can be so interpreted. *See* United Steelworkers of America v. Warrior and Gulf Navigation Co., *supra* at 581–582 of 363 U.S., 80 S.Ct. 1347.

■ Fortunately, we do not have to address Employers' *in terrorem* arguments, since the collective bargaining contract at bar contemplated that the arbitrator would exercise his considered judgment, and we find that he did. He made a conscientious effort to examine the evidence and arrive at his award. The arbitrator was explicit in saying:

> I think my clear obligation is to use my best judgment in estimating the probability of the Union's continuation as the bargaining agency, had the Employers complied with these provisions prior to June 1963.

> *Weighing all the evidence and all the imponderables as best I can,* I have concluded that the chances are about 50–50 that the Union would have survived as bargaining agency up until the present time, if these violations had not occurred.

While the arbitrator's opinion included some unfortunate phraseology, we understand his *"educated* guess" and conclusion of a "50–50 chance" to reflect his considered judgment rather than mere arbitrariness. And, in terms of substance rather than form, when we measure the result reached by the arbitrator without reference to his unfortunate use of language, the award is easily sustainable. On the basis of a blatant and conceded breach of contract, the arbitrator calculated actual and consequential damages. He was conservative in

limiting the actual damages to the Local Union's $7,000 net loss. While it is true that he could not calculate the consequential damages with absolute precision, there is always a problem of ascertaining consequential damages, even for juries and judges. Like a jury or judge in a personal injury case or contract case, he calculated the damages on the basis of the best evidence at his command. While some of the language in the arbitrator's opinion is not very precise, we do not find his conclusion at all unreasonable; it draws its essence from the agreement; it is not fundamentally irrational and does not violate due process.

Accordingly, the arbitration award will be enforced by granting summary judgment in favor of the defendant. Defendant's counsel, after consultation with plaintiffs' counsel, shall submit a form of Order within five days.